UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ADAM KARHU, on behalf of himself and all others similarly situated,

                Plaintiff,

  v.

VITAL PHARMACEUTICALS, INC., d/b/a/ VPX SPORTS,

                Defendant.

Civil Action No. 13-cv-60768-JIC

**PLAINTIFF'S MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING CLASS CERTIFICATION PURSUANT TO FED. R. CIV. P. 23(C)(1)(C)**

**REDACTED VERSION**

**TABLE OF CONTENTS**

**PAGE(S)**

I.  INTRODUCTION ................................................................................................................. 1
II. STATEMENT OF FACTS .................................................................................................. 3
III. LEGAL STANDARD .......................................................................................................... 5
IV. ARGUMENT ....................................................................................................................... 6
    A.  New Evidence Shows That Class Members Could Be Identified By Subpoenaing Retailers' Business Records ............................................................ 6
        1.  Types Of Records Available .......................................................................... 6
        2.  Karhu's Counsel Has Successfully Identified Consumers Using Subpoenas In Similar Cases ............................................................... 7
    B.  Reconsideration Is Needed To Correct Clear Error ..................................................... 8
        1.  The Court Applied An Incorrect Legal Standard For Ascertainability ................................................................................................ 8
        2.  Affidavits Are An Acceptable Means Of Identifying Class Members ...................................................................................................... 10
        3.  The Court's Manageability Concerns Are Insufficient To Defeat Class Certification ............................................................................. 12
        4.  The Court Erred By Failing To Certify A New York Subclass ..................................................................................................... 13
    C.  Reconsideration Is Needed To Prevent Manifest Injustice .................................... 14
V.  CONCLUSION .................................................................................................................. 16

**I.     INTRODUCTION**

Reconsideration of the Court's Order denying class certification is warranted for three reasons: (1) newly available evidence indicates that class members could be readily identified by issuing subpoenas to retailers, (2) the Court's holdings are precluded by clear Eleventh Circuit precedent, and (3) denial of class certification in this case will result in manifest injustice.

First, an examination of Defendant's complete sales records, first produced to Plaintiff less than five hours before he filed his motion for class certification, reveals that the retailers that sold Meltdown during the class period are virtually certain to possess records identifying hundreds of thousands of class members' Meltdown purchases. As detailed *infra* pp. 6-7, there are several categories of information that the listed retailers retain that could readily identify many, if not most class members in this case. For example, GNC, the second biggest seller of Meltdown during the class period, retains records identifying every class member that purchased Meltdown from its stores using a credit card. *See infra* pp. 6-7. And www.bodybuilding.com, the fifth biggest seller of Meltdown during the class period, retains records of all of its Meltdown sales because it is an online-only company. *See id.*[1] Plaintiff's proposals are not merely theoretical: Plaintiff's counsel has successfully used the same methods to obtain the identities of hundreds of thousands of class members in other class action cases. In fact, on March 19, 2014, Walmart, the number one seller of Meltdown during the class period (approximately 40% of all unit sales), produced to Plaintiff's counsel a spreadsheet with names, addresses, email addresses, and phone numbers for 55,533 purchasers of grass seed in another class action suit currently pending in the Southern District of New York. *See* Kopel Decl. ¶ 12. Plaintiff's proposals are a sure-fire way to identify class members without the need for self-identification.

Second, reconsideration is necessary to prevent clear error. The Court's Order relies on the Third Circuit case, *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) and its progeny to impose a higher standard for the implied requirement of ascertainability than has ever been

---

[1] www.bodybuilding.com's privacy policy explicitly states that it will release purchaser's information "to comply with any valid legal inquiry or process such as a … subpoena." *See* http://www.bodybuilding.com/fun/disclaim.htm#privacy (last accessed Mar. 26, 2013).

required by any court in this Circuit. But while *Carrera* is the law in the Third Circuit, it runs contrary to controlling Eleventh Circuit precedent. In *Fitzpatrick v. Gen. Mills. Inc.*, the Eleventh Circuit made clear that difficulties in identifying consumers who purchased small-dollar consumer products are an insufficient basis to prevent class certification. *See* 635 F.3d 1279, 1282-83 (11th Cir. 2011).[2] This was consistent with the Eleventh Circuit's instructions in *Klay v. Humana*, 382 F.3d 1241, 1272 (11th Cir. 2004)[3] that a manageability concern "will rarely, if ever, be in itself sufficient to prevent certification of a class." Moreover, the Court's failure to certify the New York Subclass runs afoul of the principle espoused in *Klay* that "if the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate." *Id.* at 1262.

Third, reconsideration is necessary to prevent manifest injustice. Plaintiff has already presented considerable evidence that Defendant peddled a fake and ineffective product to consumers. The Court's Order will effectively prevent those consumers from being able to obtain any recourse from Defendant because of the high costs of litigation compared to Meltdown's relatively low purchase price. The result of the Court's Order will not be a "million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.). To leave consumers with a complete lack of recourse in the face of Defendant's egregious misconduct would be a manifest injustice that must be prevented.

---

[2] There, the district court held that that difficulties in identifying consumers who purchased small-dollar consumer products "are not insurmountable" and that this "is not itself a sufficient basis to prevent certification of a class." 263 F.R.D. 687, 702 (S.D. Fla. 2010). On appeal, the Eleventh Circuit agreed, praising the order as "scholarly," and "sound." 635 F.3d at 1282-83.

[3] *Klay* was abrogated in part on other grounds by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

**II.     STATEMENT OF FACTS**

This action seeks relief on behalf of purchasers of VPX Meltdown Fat Incinerator ("Meltdown"), which is marketed by Defendant as a "university proven" formula that will "burn fat" for six hours, make the consumer lose weight, and is "the most powerful and university researched fat burner ever." Third Amended Complaint ¶ 1 [DE 114]. However, Dr. William Dietz, the 25 year Director of Nutrition, Physical Activity & Obesity for the Centers for Disease Control (CDC) states "that Meltdown does not have a significant effect on … burning fat" and that it "is ineffective and potentially dangerous." Expert Report of William H. Dietz at ¶¶ 15 & 16 [DE 93-1 Ex. K]. In short, the theory of liability in this case is simple: Meltdown is a fake and consumers have been duped into spending millions of dollars based upon false representations. In fact, even the authors of the so-called "university studies" admitted that Meltdown never caused any fat loss or weight loss for any participant in those studies. Motion for Class Certification at 8 [DE 70]. This type of corporate wrongdoing on an enormous scale is a classic example of precisely what a class action is designed to combat.

On May 30, 2013, Karhu served his first discovery requests upon Defendant requesting, among other things, "documents sufficient to identify all retailers who have offered Meltdown for sale, including the name, location and approximate sales volume for each such retailer." Kopel Decl. Ex. A at 7 (Request No. 19).

On December 6, 2013, Karhu's counsel deposed David Wisdom, Defendant's 30(b)(6) witness for the purpose of Meltdown's sales. At the deposition, Karhu's counsel learned that a significant amount of sales data had been withheld from Karhu in the course of discovery. Kopel Decl. ¶ 3.

Later, On December 6, 2013, Karhu's counsel requested that Defendant produce complete sales records immediately. Defendant agreed that it would promptly do so. *See* Kopel Decl. Ex. ¶ 4.

On December 9, 2013, after still having not received the discovery requested, Karhu's counsel sent Defendant an email stating: "[w]e have asked several times for all sales data in an

3

excel spreadsheet, including the 72-count bottle figures not yet produced. This should have been produced as part of VPX's response to discovery a long time ago. Please send today." Kopel Decl. Ex. C.

On December 10, 2013, at 1:04 p.m., Defendant produced documents bearing bates numbers VPX004908-5053. While these documents contained some Meltdown sales data, they were still incomplete. Kopel Decl. ¶ 6.

On December 10, 2013, at 6:00 p.m., Karhu's counsel sent Defendant an email stating: "Victoria, AGAIN the data does not include the 72 count bottles. This omission was the problem with your first response to production as well. Mr. Wisdom confirmed that this data was and is available at his deposition last week and you agreed to produce it. Please send now." Kopel Decl. Ex. C.

On December 11, 2013, at 10:26 a.m., Defendant produced documents bearing bates numbers VPX005054-5198. While these documents contained some Meltdown sales data, they too, were incomplete. Kopel Decl. ¶ 8.

On December 11, 2013, at 5:27 p.m., Karhu's counsel sent Defendant an email stating that the production was "woefully incomplete." Karhu's counsel further stated: "I will be seeking sanctions tomorrow if complete data is not produced tonight." Kopel Decl. Ex. D.

On December 13, 2013, at 1:45 p.m., less than five hours before Karhu filed his motion for class certification, Defendant's counsel sent Karhu's counsel an email stating that she had been sick for several days and just saw their emails that morning. Attached to that email, Defendant produced documents bearing bates numbers VPX005199-005402. These documents were the complete sales data Karhu had requested six and a half months earlier. Kopel Decl. ¶ 10.

On December 13, 2013, at 6:24 p.m., Karhu filed a motion for class certification. His motion sought to certify a "class defined as 'all persons in the United States who purchased Meltdown from April 4, 2008 to date'" and "a subclass of 'all Class members who purchased the

4

product in New York.'" DE 70 at 2. Karhu did not have the benefit of Defendant's complete sales data at the time his counsel drafted the motion.

On December 23, 2013, Karhu's counsel took a second deposition of David Wisdom. There, Wisdom testified at length about Defendant's December 13, 2013 document production. Kopel Decl. ¶ 11.

On March 3, 2014, the Court issued an Order denying class certification. See Order [DE 125]. The Order found that the proposed classes were "adequately defined." *Id.* at 4-5. It also found that Karhu's motion satisfied the numerosity, commonality, typicality and adequacy of representation requirements. *Id.* at 7-12.

However, the Order held that ascertainability was not satisfied because the court lacked a "practical means of verifying class membership through existing evidence." *Id.* at 6. It also held that individual issues predominated over the claims asserted for the nationwide class because of variations in state laws for the various claims. *Id.* at 12-18. Finally, it found that common issues predominated for the New York subclass, but declined to certify it alone, because Karhu "has brought this action first and foremost as a nationwide class action." *Id.* at 18-20.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." There are three grounds which justify the filing of a motion for reconsideration: "1) an intervening change in controlling law; 2) the availability of new evidence; and 3) the need to correct clear error or prevent manifest injustice." *Williams v. Cruise Ships Catering & Serv. Int'l, N.V.*, 320 F. Supp. 2d 1347, 1357-58 (S.D. Fla. 2004); *Reyher v. Equitable Life Assur. Soc.*, 900 F. Supp. 428, 430 (M.D. Fla. 1995). A motion for reconsideration is not intended to be a tool for relitigating what a court has already decided. *Reyher*, 900 F. Supp. at 430. Rather, it "must demonstrate why the court should reconsider its prior decision and set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Id.* (internal quotations omitted). The Eleventh Circuit has held that "[a] motion for reconsideration should not be used as a vehicle to

5

present authorities available at the time of the first decision or to reiterate arguments previously made. Rather, it is appropriate where the Court has patently misunderstood a party, or has made a decision outside of the adversarial issues presented to the Court by the parties, or has made an error not of reasoning, but of apprehension .... Such problems rarely arise and the motion to reconsider should be equally rare." *Del. Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1384 (11th Cir. 2010) (internal citations and quotation marks omitted).

IV.   ARGUMENT

   A.   New Evidence Shows That Class Members Could Be Identified By Subpoenaing Retailers' Business Records

The evidence produced by Defendant on the eve of Plaintiff's motion for class certification shows that most class members' purchases are easily obtainable directly from VPX or by sending subpoenas to the retailers identified in the sales records.

   1.   Types Of Records Available

There are several categories of records that can be subpoenaed from the retailers listed in Defendant's sales records.

First, the records show that approximately ▮▮▮▮ units were sold either directly to individuals or private health or sports organizations. Each of these class members can be directly identified from VPX's records. Weir Decl. ¶ 5.

Second, retailers have records of all online sales of Meltdown. The records show that VPX sold approximately ▮▮▮▮ units of Meltdown to online-only retailers. These retailers are necessarily in possession of the names, emails, and addresses of their customers. *Id.* ¶ 4.

Third, even the so-called brick and mortar stores conduct significant online sales. These stores also have the same information.

Fourth, retailers can identify class members that purchased Meltdown with credit cards. For example, GNC, the second-largest seller of Meltdown during the class period, states on its website that it retains identifying information for all credit card purchases:

> When you purchase products and services at one of our Stores, you can do so anonymously when you pay with cash. If you use a credit or debit card for any of your purchases, we will collect your credit or debit card

6

>   information and keep a history of your purchases. We use this information
>   to process your orders and to better assist you when you visit or call us.

GNC Website.[4] This practice is not limited to GNC – it is done by many, if not most, major retailers. These retailers have identifying information for class members who bought Meltdown with credit cards.

<u>Fifth</u>, most retailers listed in the records have loyalty programs. These programs track all purchases their members make. Use of these programs is widespread: as of 2010, U.S. consumers held 2.65 billion loyalty program memberships.[5] Using subpoenas, Karhu could obtain identifying information for all class members who used loyalty program cards to purchase Meltdown.

### 2. **Karhu's Counsel Has Successfully Identified Consumers Using Subpoenas In Similar Cases**

These concepts are not merely hypothetical. Bursor & Fisher, P.A. ("B&F") has successfully subpoenaed records from third party retailers to identify class members in two similar cases in the past month alone.

For example, on March 19, 2014, Walmart produced to B&F a spreadsheet with names, addresses, email addresses, and phone numbers for 55,533 purchasers of the Scotts EZ Seed product in response to a subpoena B&F sent to it in the case of *Arcuri v. The Scotts Miracle-Gro Company, Inc.*, No. 12-cv-4727 (VB) (S.D.N.Y. Jun. 15, 2012). *See* Kopel Decl. ¶ 12. Here, more than 40% of Meltdown sales occurred through Walmart. If Walmart can produce information about grass seed purchasers, it can do the same for Meltdown purchasers.

Likewise, on March 20, 2014, Big Lots, Inc. produced a list of 66,158 names and addresses of purchasers of Capatriti 100% Pure Olive Oil in response to a subpoena B&F sent to it in the case of *Ebin v. Kangadis Food Inc.*, No. 13-cv-2311 (S.D.N.Y. Apr. 8, 2013). *Id.* ¶ 13.

---

[4] *Available at* http://www.gnc.com/helpdesk/index.jsp?display=safety&subdisplay=privacy (last accessed Mar. 26, 2014).

[5] *See* Tyrel Linkhorn, *Retailers Use Variety of Ways to track Consumer Habits Through Loyalty Programs*, The Blade, Aug. 11, 2013, at 1, *available at* http://www.toledoblade.com/Retail/2013/08/11/Retailers-use-variety-of-ways-to-track-consumer-habits-through-loyalty-programs.html.

And on March 28, 2014, in the same case, Wakefern Corporation produced 132,366 names of Capatriti 100% Pure Olive Oil purchasers. *Id.*

Notably, Meltdown is considerably *more likely* to be purchased online than grass seed or olive oil because it weighs much less than those products do. And people are also more likely to purchase Meltdown online because it is available in fewer stores than grass seed or olive oil. Thus, there is good reason to believe that even more Meltdown consumers can be identified from each retailer than were in the above two examples. By sending subpoenas to the major retailers that sold Meltdown during the class period, Karhu could identify many, if not most class members.

      B.      <u>**Reconsideration Is Needed To Correct Clear Error**</u>

Plaintiff respectfully suggests that reconsideration of the Court's order is necessary to correct clear legal error. In its Order denying class certification, the Court adopted the holdings of the *Carrera* case and its progeny in applying a heightened legal standard for ascertainability not previously required in the decisions of any court in this Circuit. In fact, the Court's holding is a significant departure from its own recent decisions. For example, in *Smith v. Wm. Wrigley Jr. Co.*, 2010 WL 2401149 (S.D. Fla. Jun. 154, 2010) the Court certified a class of purchasers of chewing gum and approved notice by publication because "Wrigley does not sell the Product directly to consumers, and thus there is no way to identify the vast majority of individual class members." *Id.* at *6. But more importantly, as detailed below, the holding of *Carrera* and its progeny are in direct conflict with several important decisions from Eleventh Circuit. Given this clear precedent from the Eleventh Circuit, this Court is without authority to adopt contrary holdings from another Circuit.

      1.      <u>**The Court Applied An Incorrect Legal Standard For Ascertainability**</u>

The Court's decision essentially holds that ascertainability requires plaintiffs to prove that they are able to identify almost every member of the proposed classes in a claims process. That requirement is not just novel – it is at odds with Eleventh Circuit precedent, leading civil procedure treatises, and Rule 23 itself.

8

"[A] plaintiff seeking to represent a proposed class must establish that the proposed class is 'adequately defined and clearly ascertainable.'" *Little v. T Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)). "[A] class must exist," and it must "be susceptible of precise definition." 5 Moore's Federal Practice § 23.21[1] (3d ed. 1997). The requirement has always "focus[ed] on the question of whether the class can be ascertained by object criteria" as opposed to "subjective standards (e.g., a plaintiff's state of mind) or terms that depend on resolution of the merits (e.g., persons who were discriminated against)." Rubenstein, § 3:3, Manual for Complex Litigation § 21.222 (4th ed. 2004). For example, in *Walewski v. Zanimax Media, Inc.*, 502 Fed. Appx. 857, 861 (11th Cir. 2012), this Eleventh Circuit affirmed the denial of certification for a class of video game purchasers where:

> [T]he proposed class includes all persons or entities nationwide, who purchased any version of the game, presumably from anyone, anywhere, at any time—whether or not they ever were injured by (or experienced) the alleged [a]nimation [d]efect. This overbroad definition is not limited in any way to persons who purchased from Defendants, and therefore presumably includes persons who purchased a copy of the game—new or used—from anyone else.

Thus, the Eleventh Circuit found that the ascertainability requirement was not met where the class definition was overbroad. Simply put, the ascertainability requirement is focused on the need for a precise class definition; not on a purported necessity to identify class members at the time of certification.

In this regard, the case of *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279 (11th Cir. 2011) is instructive. As here, that case involved claims alleging deceptive advertising of an over-the-counter product (yogurt touted for its digestive health benefits). As here, the defendant argued against certification because "individualized fact-finding" was required "to ascertain the members of the class." *Id.* at 1282. But the district court rejected this argument, stating:

> The Court recognizes that certification raises some "likely difficulties" under Rule 23(b)(3)(d). For example, identifying those consumers that bought Yo–Plus, and of that group, who paid a premium for it, will not be an easy process. Likewise, calculating the appropriate compensation for each plaintiff will require some

9

> effort. Nevertheless, these issues are not insurmountable, see, e.g., Decl. of Jeffrey Leibell in Supp. of Pl.'s Mot., and this difficulty is not "in itself a sufficient basis to prevent certification of a class," Klay, 382 F.3d at 1272.

*Fitzpatrick v. Gen. Mills, Inc.*, 263 F.R.D. 687, 702 (S.D. Fla. 2010) (citing *Klay v. Humana*, 382 F.3d 1241, 1272 (11th Cir. 2004)).  On appeal, the Eleventh Circuit agreed with the district court, finding its order "scholarly," "sound," and "well within the parameters of Rule 23's requirements."  635 F.3d at 1282-83.  The only flaw the court saw, easily fixable on remand, was that the class definition's wording included a subjective component (whether consumers bought yogurt "to obtain its claimed digestive health benefit") that is impermissible under the traditional understanding of ascertainability.  *Id.*  The Eleventh Circuit approved of the class if "defined as 'all persons who purchased [the product] in the State of Florida.  *Id.* at 1283 & n.1.  Here, the Court's decision directly conflicts with the Eleventh Circuit's holding in *Fitzpatrick*.

The Eleventh Circuit reiterated these principles in *Nelson v. Mead Johnson & Johnson Co.*, 484 Fed. Appx. 429 (11th Cir. 2012).  There, the court affirmed this Court's approval of a class action settlement for defective baby formula, which provided for notice to be made to class members through publication and which allowed class members without proof of purchase.  *See* Final Order Approving Settlement at ¶ 12 [Ex. C].  Like *Fitzpatrick*, *Nelson* runs contrary to the Court's holding here, which refuses to accept publication notice.  See DE 125 at 5-6.

Finally, it should be noted that Rule 23 does not require that "all" class members be identified at the class certification stage.  Rather, the text of Rule 23, which requires individual notice only to class members "who can be identified through reasonable effort," Fed. R. Civ. P. 23(c)(2)(B), implicitly assumes that there will be class members who cannot be identified.  Thus courts routinely certify classes of purchasers of over-the-counter products where it will be impossible to identify every member of the class.  *See* Kopel Decl. Ex. E (list of 34 such cases).

### 2. Affidavits Are An Acceptable Means Of Identifying Class Members

In its decision, the Court voiced concerns that "accepting affidavits of Meltdown purchases without verification would deprive VPX of its due process rights to challenge the

10

claims of each putative class member." DE 125 at 6. But Plaintiff respectfully suggests that this in unfounded. The Eleventh Circuit has already held that "a defendant has no interest in how the class members apportion and distribute a damage fund among themselves." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1258 (11th Cir. 2003) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 481 (1980)).

Specifically, the *Allapattah* court found that a defendant can only have an interest in the claims process where it has "certain defenses to each [class member's] claim." *Id*. at 1259. This is because such "defenses" could affect the total amount of the defendant's liability. *Id.* By contrast, the court held that "[w]here the only question is how to distribute the damages, the interests affected are not the defendant's but rather those of the silent class members." *Id.* (quoting *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990)). Finally, the Eleventh Circuit also held that addressing individual issues among class members is only appropriate where individual claims are for large sums:

> If the only issue is to determine the amount of damages which class members are entitled to receive and this determination can be accomplished almost mechanically ... especially when individual claims are small or relatively modest. ... On the other hand, when large claims are involved ... one would expect that they would be more hotly contested by the defendants and more vigorously asserted by the claimants. The economic stakes being more substantial in large claims, fairness dictates that the procedures should allow for a more formal adversary proceeding.

*Id.*

Here, VPX has no interest in the claims process because class members' claims are subject to common proof. See DE 125 at 18-19 (finding that "common issues predominate on the N.Y. Gen. Bus. Law § 349 claim"). VPX's total liability will be therefore be determined at trial if Karhu can prove his case, and will not increase or decrease based on the structure of the claims process. Finally, because the sum of individual claims will be small (Karhu purchased Meltdown for $23.34), fairness does not "dictate[] that the procedures should allow for a more formal adversary proceeding" in the claims process. *Allapattah*, 333 F.3d at 1259. VPX is

11

therefore not "prejudiced … by an inability to defend against consumers who are unable to prove their purchases" and is not "constitutionally entitled to compel a parade of individual plaintiffs to establish damages." *In re Antibiotic Antitrust Actions*, 333 F. Supp. 278, 289 (S.D.N.Y. 1971).

Finally, Plaintiff respectfully suggests that the Court's concern that "using affidavits to determine class membership would … invite fraudulent submissions and could dilute the recovery of genuine class members" is unfounded and speculative. See DE 125 at 6. Such a situation could only occur if there would be so many claims that the total amount would exceed VPX's liability and thus materially reduce true class members' relief. But this hypothetical does not occur in real life. "[C]onsumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011).

### 3. The Court's Manageability Concerns Are Insufficient To Defeat Class Certification

The Court stated that the case "would be unmanageable as a class action" because "the Court lacks a practical method of verifying membership in the Proposed Classes of Meltdown purchasers." DE 125 at 4. But this is an insufficient basis on which to deny class certification. A manageability concern "will rarely, if ever, be in itself sufficient to prevent certification of a class." *Klay*, 382 F.3d at 1272. "Courts are generally reluctant to deny class certification based on speculative problems with case management. Even potentially severe management issues have been held insufficient to defeat class certification." *Id.* at 1272-73 (internal quotations and citations omitted).

In *Klay*, the Eleventh Circuit articulated "two points generally applicable through [a] 'superiority' analysis:"

> First, we are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives (including, most notably, 600,000 separate lawsuits by the class members). Second, where a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions.

*Id.* at 1273. Here, the Court did not conduct any analysis comparing the manageability problems it perceived to the prospect of thousands of individual suits. And the Court specifically held that common issues predominated over at least one of Petitioner's claims. *See* DE 125 at 18 (finding that "common issues predominate on the N.Y. Gen. Bus. Law § 349 claim"). Per the two points articulated in *Klay*, Plaintiff respectfully suggests that the Court should have been "hard pressed to conclude that a class action is less manageable than individual actions."

VPX sold over a million units of Meltdown during the class period. Weir Decl. ¶ 10. This implies that there are tens (and more likely, hundreds) of thousands of individual class members in this case whose claims are predicated on the same, simple theory: that Meltdown is worthless and ineffective. Even assuming an individual determination of eligibility were be required for each one, that would still be more administratively manageable than requiring tens or hundreds of thousands of class member to individually prove the entire merits of the case.

### 4. The Court Erred By Failing To Certify A New York Subclass

Finally, Plaintiff respectfully suggests that the Court erred by failing to certify the New York subclass. *See* DE 125 at 2 ("Karhu also proposes a subclass comprising all members of the Nationwide Class who purchased Meltdown in New York"). In its decision, the Court held that a predominance analysis failed for most of Karhu's claims *solely* because of variations in state law. DE 125 at 12-18. But the Court also held that "common issues predominate on the N.Y. Gen. Bus. Law § 349 claim" because the law of only one state was implicated. *Id.* at 18-19. In fact, the Court noted that:

> The Court could theoretically certify Karhu's proposed New York
> Subclass to allow pursuit of the section 349 claims, and perhaps
> also the MMTA, express warranty, and unjust enrichment claims
> as limited to New York consumers. This solution would reduce
> the problems raised by applying the laws of multiple states.

DE 125 at 20. Ultimately, however, the Court refused to do so because Karhu "has brought this action first and foremost as a nationwide class action, and the Court declines to drastically redefine the action *sua sponte* as one only on behalf of New York consumers." *Id.* But this is contrary to Eleventh Circuit precedent. In *Klay*, the Eleventh Circuit reasoned that although

13

individualize issues would likely predominate in a nationwide class alleging state law causes of action, "if the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate." 382 F.3d at 1262. Thus, even where predominance may defeat certification of the general class, certification of a subclass is still appropriate. Here, notwithstanding that the Court found that predominance was not met on behalf of the nationwide class, certification of the New York subclass was appropriate. And doing so would not have constituted redefining Karhu's motion as he included a subclass of New York residents for this exact reason.

### C. Reconsideration Is Needed To Prevent Manifest Injustice

Reconsideration is also needed to prevent manifest injustice in this case. The Court's decision introduces a novel holding that deals a blow to all existing and future small-dollar consumer class actions: that class certification may be defeated on the basis of "ascertainability" even when the existence of a well-defined class is not in doubt and the full extent of potential liability is known. This holding has the effect of precluding all consumers of Meltdown from any possibility of recourse against a company that wilfully sold them a fake product. Reconsideration is needed to prevent this manifest injustice from taking place.

The decision denies class certification for three reasons: (1) the defendant "does not have a record of the identities of most [class] members;" (2) class members "probably have not retained their receipts or other proofs of purchase;" and (3) the court will not "trust individuals to identify themselves as class members through the submission of affidavits." DE 125 at 5-6. Based on these reasons, the Court held that the proposed classes were not ascertainable, despite finding that the plaintiff "has adequately defined his proposed classes … enough to allow the Court to understand whether a particular individual is a member of the class." *Id.* at 4.

That holding is unprecedented in this Circuit and erects a much higher hurdle than is required or allowed under Rule 23. *See supra* pp. 8-13. It effectively requires a showing of a complete record of all product purchasers at the class certification stage to prevail. This

14

unprecedented requirement dooms "most small-claims consumer class actions. Who, after all, has proof that they purchased peanut butter, pineapples, or aspirin?"[6] And "permitting defendants to evade class actions based on their own insufficient records would give companies an incentive to engage in shoddy record-keeping or even to destroy their files."[7]

In reaching its decision, the Court relied on the Third Circuit case, *Carrera v. Bayer Corp.*, 727 F.3d 300, 305-09 (3d Cir. 2013) and its progeny which reject the use of affidavits as proof of class membership in consumer class action cases. But these cases are not the law in this Circuit. In fact, they contradict established case law in this Circuit and every other Circuit outside of the Third. And several courts have recently warned of the dire consequences of adopting such a heightened ascertainability requirement. For example, the court in *Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013) recently stated:

> If class actions could be defeated because membership was difficult to ascertain at the class certification stage, "there would be no such thing as a consumer class action." *Ries,* 287 F.R.D. at 536. As long as the class definition is sufficiently definite to identify putative class members, "[t]he challenges entailed in the administration of this class are not so burdensome as to defeat certification." *Id.*

*Id.* at 500. Likewise, in *Ebin v. Kangadis Food, Inc.*, 2014 WL 737960 at *5 (S.D.N.Y. Feb. 25, 2014), the court explained that *Carrera*'s heightened ascertainability standard

> would render class actions against producers almost impossible to bring. Yet the class action device, at its very core, is designed for cases like this where a large number of consumers have been defrauded but no one consumer has suffered an injury sufficiently large as to justify bringing an individual lawsuit. Against this background, the ascertainability difficulties, while formidable, should not be made into a device for defeating the action.

*Id.* at *5. *See also McCrary v. The Elations Co., LLC*, 2014 U.S. Dist. LEXIS 8443 at *24 (Jan. 13, 2014) ("*Carrera* eviscerates low purchase price consumer class actions in the Third

---

[6] Gilles, *Class Dismissed: Contemporary Judicial Hostility to Small-Claims Consumer Class Actions*, 59 DePaul L. Rev. 305, 312 (2010).

[7] Seltz & Elias, *The Limited Scope of the Ascertainability Requirement*, American Bar Association, Mar. 18, 2013, http://bit.ly/1eFc8PK.

Circuit."). Rule 23's drafters intended it to allow "groups of people who individually" could not "bring their opponents into court at all" to band together to vindicate their rights. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 617 (1997). If adopted by other courts, this holding would come perilously close to completely depriving such groups of that privilege.

It would be particularly unjust for ascertainability concerns to pose an obstacle to class certification here. The evidence in this case leaves little doubt that Defendant peddled a fake product to consumers. Without class certification, they will retain the profits of that fraud and be incentivized to repeat their illegal conduct. This is precisely the type of case that requires class treatment if there is to be any possibility of redress. As Judge Posner put it:

> "The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30. But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative – no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied – to no litigation at all."

*Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). Concerns over the potential for false claims in the post-judgment distribution process pale by comparison to concerns over the actual deceptive and unfair conduct that has already been committed by Defendant.

## V.   CONCLUSION

Plaintiff respectfully requests that the Court reconsider its earlier Order denying class certification.

Dated: March 31, 2014					Respectfully submitted,

/s/Barry L. Davis
Barry L. Davis, Esq.  (State Bar No. 294977)
E-Mail:  davis@tdflaw.com
Daniel R. Lever, Esq. (State Bar 044485)
E-Mail: lever@tdflaw.com
**THORNTON, DAVIS & FEIN, P.A.**
80 SW Eighth Street, Suite 2900
Miami, Florida 33130
Telephone: (305) 446-2646
Facsimile:  (305) 441-2374
Attorneys for Plaintiff

        and

        Scott A. Bursor, Esq. (State Bar No. 68362)
        E-Mail:  scott@bursor.com
        Yitzchak Kopel, Esq. (Admitted *Pro Hac Vice*)
        E-Mail:  ykopel@bursor.com
        **BURSOR & FISHER, P.A.**
        888 Seventh Avenue
        New York, NY 10019
        Telephone: (212) 989-9113
        Co-Counsel for Plaintiff

## **CERTIFICATE OF SERVICE**

      **I HEREBY CERTIFY** that on March 31, 2014, I electronically filed the foregoing with the Clerk of the Southern District of Florida, using its CM/ECF system, which would then electronically notify the attorneys or parties of record per the Service List below.

        By:    /s/Barry L. Davis
                Barry. L. Davis

## **SERVICE LIST**

Victoria N. Godwin, Esq.
E-Mail: vickeyg@vpxsports.com
**VITAL PHARMACEUTICALS, INC.**
1600 North Park Drive
Weston, Florida 33326
Telephone: (954) 641-0570
Facsimile: (954) 389-6254
*Attorneys for Defendant*
*Vital Pharmaceuticals, Inc*.

Scott A. Bursor, Esq.
E-Mail:  scott@bursor.com
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Co-Counsel for Plaintiff

Yitzchak Kopel, Esq.
E-Mail:  ykopel@bursor.com
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Admitted *Pro Hac Vice* as Co-Counsel for Plaintiff